Sparkman v. Wabash Railroad.

---

## SAMUEL SPARKMAN, JR., Respondent, v. WABASH RAILROAD COMPANY, Appellant.

### St. Louis Court of Appeals, June 8, 1915.

1. **NEGLIGENCE: Instructions: Conformity to Evidence.** In a negligence action, no matter how broad the petition may be, the instructions should submit only the specific negligence developed by the evidence, and it is proper to withdraw, by instruction, issues pleaded that are not supported by the evidence.

2. **RAILROADS: Master and Servant: Injury to Engineer: Sufficiency of Evidence.** In an action for injuries to a locomotive engineer by an explosion of his engine, evidence *held* insufficient to justify a finding that the crown sheet, as distinguished from the stay bolts, was defective, and hence it was proper to withdraw that issue from the jury. [NORTONI, J., dissents.]

3. **MASTER AND SERVANT: Injury to Servant: Burden of Proof.** An employee, suing for personal injuries, has the burden of proving negligence of the employer and a causal connection between such negligence and the injury; and, where the injury might have resulted from one of two causes, for only one of which the employer is liable, the employee must show with reasonable certainty that the cause for which the employer is liable produced the injury.

4. **EVIDENCE: Burden of Proof: Evidence Evenly Balanced.** Where the evidence is evenly balanced, the party upon whom

the burden of proof rests has failed to sustain his burden, and the adverse party is entitled to a verdict.

5. **APPELLATE PRACTICE:** New Trial: Scope of Review. While trial courts are vested with a wide discretion in granting new trials, yet a new trial, granted under a mistake of law, will be reversed, on appeal, unless it can be upheld on some other ground of the motion.

**NORTONI, J., dissents.**

Appeal from Monroe Circuit Court.—*Hon. William T. Ragland,* Judge.

REVERSED AND REMANDED (*with directions*).

*J. L. Minnis* and *David H. Robertson* for appellant.

(1) The verdict was for the right party; plaintiff was not entitled to recover, and the court should have given defendant's peremptory instructions. (a) There was no evidence that the defects testified to by plaintiff's witness, Hopson, caused the explosion; and (b) it could just as reasonably be inferred that the explosion was the result of low water as that it was the result of any other cause. Breen v. St. Louis Cooperage Co., 50 Mo. App. 202; Byerly v. Light & Power Co., 130 Mo. App. 593; Goransson v. Manufacturing Co., 186 Mo. 300; Plefka v. Knapp, Stout & Co., 145 Mo. 316; Kane v. Railroad, 251 Mo. 13; Warner v. Railroad, 178 Mo. 134; Beebe v. Transit Co., 206 Mo. 419; Coin v. Lounge Co., 222 Mo. 488; Trigg v. Land & Lumber Co., 187 Mo. 227; Brown v. Land & Lumber Co., 65 Mo. App. 162; Jones v. Yeager, 2 Dillon, 68; Dunphy v. Stock Yards Co., 118 Mo. App. 516; Railway v. Dubois, 56 Ill. App. 181, 65 Ill. App. 142. (2) There was no error in giving defendant's instructions No. 1 and No. 2. These instructions submitted to the consideration of the jury conditions testified to on behalf of plaintiff. (3) There was no

error in giving defendant's instruction No. 5. Byers v. Wallace, 28 S. W. (Texas) 1056; Deuchler v. Insurance Co., 51 Mo. App. 156; Blashfield on Instructions, sec. 349; Byerly v. Light & Power Co., supra; Warner v. Railroad, supra; Kane v. Railroad, supra; cases cited under point 1.

*M. J. Lilly* for respondent.

(1) Under the pleadings there was abundant testimony to take the case to the jury. (a) The defective condition of the crown sheet and its fastenings is conclusively shown, and there is evidence from which it may be reasonably inferred this caused the explosion. (b) All of the direct and positive testimony on the point negatives the contention that the explosion was caused by low water, because the water supply in the boiler was shown to be ample by the only two tests known—the gauge cocks and the water glass. (2) The giving of defendant's instruction number 1 and number 2 was error. (a) Said instruction number 1 ignores the allegation in plaintiff's petition and the evidence in support thereof as to the defective condition of the crown sheet and in effect directs a verdict for defendant unless the jury find that plaintiff was injured by reason of defective radial stays "and from no other cause." (b) Said instruction number 2 limits plaintiff's right of recovery in the same way. Instructions should be predicated on the whole case. First National Bank of Warsaw v. Currie, 44 Mo. 91; Sheedy v. Streeter, 70 Mo. 679. (3) The giving of defendant's instruction number five was error. This instruction authorized a verdict for defendant in this language: "If it appears as reasonable to you that said explosion was the result of water becoming low on or around said crown sheet as that it may have been due to defective radial stays

in the crown sheet, then you will return a verdict for the defendant.'' This instruction not only authorizes the jury to ignore the evidence as to the defective condition of the crown sheet, but commissions them to enter the field of speculation in arriving at a verdict. (4) Where there has been a misdirection of the jury by the court and the court is satisfied that an improper verdict was occasioned thereby, the court shall, on motion of the proper party, grant a new trial. Sec. 2022 R. S. Mo. 1909. (a) The granting of a new trial rests within the sound discretion of the court. Farrell v. Transit Co., 103 Mo. App. 454; Coleman v. Cole, 96 Mo. App. 22; Rodan v. Transit Co., 207 Mo. 392; McCarty v. Transit Co., 192 Mo. 396; Gould v. St. John, 207 Mo. 619. (b) And the court's action will not be disturbed unless it appears that it used its discretionary power in an arbitrary or wrongful manner. Taylor v. Railroad, 163 Mo. 183; Rodan v. Transit Co., 207 Mo. 392; McCarty v. Transit Co., 192 Mo. 396; Ridge v. Johnson, 129 Mo. App. 541.

ALLEN, J.—This is an action for personal injuries sustained by plaintiff while in the employ of the defendant as a locomotive engineer. On November 9, 1910, while plaintiff was in charge of a locomotive engine of the defendant drawing a train of freight cars and proceeding from Hannibal to Moberly, in this State, the fire-box of the engine ''let down,'' causing an explosion whereby plaintiff was slightly burned upon the wrist, and it is claimed that later, by reason of the explosion, his hearing became affected. It appears that the plaintiff had driven this engine with a train of freight cars from Moberly to Hannibal on the previous evening, and that at 1:20 a. m. on November 9, 1910, he began the return trip to Moberly. He had proceeded but about twelve and one-half miles from Hannibal when the explosion occurred.

The petition alleges that defendant negligently provided plaintiff with a locomotive that was dangerous, defective and unsafe for use, in that "the crown sheet of said engine and the fastenings by which it was held in place were weak, defective and insecure and liable to break and give way, thereby causing the boiler of said engine to explode." The testimony adduced by plaintiff to support these allegations of the petition will be noticed later.

Plaintiff's evidence shows that the engine left Hannibal with both the tank and boiler full of water, and tends to show that sufficient water was kept in the boiler to cover the crown sheet above the fire-box until at least a few minutes prior to the accident. The testimony of plaintiff and the fireman respecting the stage of the water in the boiler shortly prior to the explosion need not be stated. While it is to the effect that there was water over the crown sheet within a few minutes of the explosion, it does not appear to be inconsistent with the theory of the defense that in running down hill, after ascending an upward grade for about eight miles, the water ran forward in the boiler, and because of insufficient water therein the crown sheet was left uncovered, causing it to be burned out. And much testimony was adduced by defendant relative to the condition of the engine after the explosion, and expert opinions thereupon, tending to show that the crown sheet burned out and dropped from the stay bolts because it was not kept covered with water.

The trial, before the court and a jury, resulted in a verdict for the defendant. Thereafter the court sustained plaintiff's motion for a new trial upon, the ground that error had been committed in giving three instructions for defendant. These instructions, numbered 1, 2 and 5, are as follows:

1.. "The court instructs the jury that the burden is upon the plaintiff in this case to establish to the

reasonable satisfaction of the jury, by the greater weight of the evidence given in the case, that the plaintiff was injured by reason of defective radial stays in the crown sheet of said engine, and that by reason of said defective radial stays, and from no other cause, said crown sheet gave way and caused the explosion, and that plaintiff was injured thereby; and unless the plaintiff has so proven to your satisfaction, you will return a verdict for the defendant.''

2. ''The court instructs the jury that you cannot consider any defect in any part of the fire-box of said engine, except such defects as the evidence shows were in the crown sheet at the time of or prior to the explosion, and you will disregard all evidence in the case as to any defective stay bolts or radial stays in any other part of the engine, except in the crown sheet; and unless you believe from the evidence in the case that the explosion occurred as the result of defective radial stays in said crown sheet, then you will return a verdict for the defendant.''

5. ''The court instructs the jury that if you are unable to determine, from the evidence in the case, the cause of said explosion, or if it appears as reasonable to you that said explosion was the result of water becoming low on or around said crown sheet as that it may have been due to defective radial stays in the crown sheet, then you will return a verdict for the defendant.''

Plaintiff's main instruction, following the lines of his petition, authorizes a recovery if the jury find that the explosion was caused by the negligence of defendant in furnishing plaintiff with an engine which was defective and unsafe for use by reason of *the crown sheet and the fastenings thereof* being weak, insecure, etc. This includes defects, if any, in the crown sheet itself as distinguished from the ''fastenings'' thereof, i. e., the stay bolts or radial stays. Defendant's instructions, on the other hand, withdraw from the

consideration of the jury any defective condition of the crown sheet separate and apart from the radial stays thereof. Defendant's instruction No. 2 does permit a consideration of defects in the crown sheet, but only in the radial stays therein as though such stays formed a part of the crown sheet.

Though the petition is broad enough to cover defects in the crown sheet generally, it was proper to confine the issue to the specific defects alone which the evidence tended to establish. For no matter how broad the petition may be, the instructions should submit only the specific negligence developed on the trial by the evidence adduced. [See Feldeworth v. Railroad, 181 Mo. App. l. c. 640, 164 S. W. 711; Miller v. United Rys. Co., 155 Mo. App. 528, l. c. 546, 134 S. W. 1045.] The immediate question for consideration, therefore, is whether or not there is any evidence in the record to authorize the submission to the jury of any defect in the crown sheet apart from defective stay bolts.

The crown sheet is that portion of the boiler directly above the fire-box of the engine, forming the roof of the fire-box. Because of the great pressure upon it from above, and the fact that the fire is immediately beneath it, the crown sheet is supported by a great many bolts, or rods, extending through it and fastened into the boiler above, termed stay bolts or radial stays. It appears that there were more than four hundred of these in this crown sheet, the heads thereof being about four inches apart in the roof of the fire-box.

There is no evidence of any crack or other like specific defect in the crown sheet; and the only testimony that lends any color of support to respondent's contention in this regard is that of the witness Hopson, who was a boiler maker in the employ of the defendant at the time in question. He testified that he had examined this engine in Moberly, in the forenoon

of November 8, 1910, the day prior to the explosion. When asked as to the condition in which he found it, he answered: "I found five broken stay bolts and about six bolts pulling through the sheet." His further testimony touching the matter is as follows: Q. "How many did you say you found broken?" A. Six broken." Q. "And what was the condition of the others you found?" A. "Heads pulling through the sheet, heads pulled off, just like the heads pulled off the sheet, through the sheet." Q. (Mr. Robertson) "You said heads pulled off?" A. "Yes, sir." The evidence shows that the crown sheet dropped off from the heads of more than one hundred of these bolts at the time of the explosion; but there is no evidence, unless it be that of the witness Hopson, tending to show that prior thereto any of these heads were "pulling through the sheet."

The argument advanced in support of the court's action in granting the new trial is that the testimony of the witness Hopson to the effect that he found some of the heads of these stay bolts pulling through the sheet is some evidence of a defective condition of the crown sheet itself; i. e., that if the heads of some bolts —the witness says six—were pulling through the sheet this would mean a weakening of the crown sheet itself as distinct from the stay bolts. We have carefully considered this testimony, and do not see how it can be said to constitute any evidence that there were defects in the crown sheet as a thing separate and apart from the stay bolts. The argument that the ends of these bolts, extending down through the crown sheet, with heads on the lower side thereof and serving to form a part of the roof of the fire-box, constituted a part of the crown sheet, and that a defect in the heads or ends of the bolts would consequently be a defect in the crown sheet, avails nothing here; for to the extent that the ends or heads of the stay bolts may be said to constitute a portion of the crown sheet the jury were

at liberty to consider defects in the crown sheet under the instructions given. The question is whether the foregoing testimony tends to prove that the crown sheet was otherwise defective.

It is argued that by "heads pulling through the sheet" this witness meant that heads were being sunk into the sheet itself, thereby weakening the latter and rendering it defective. Of this it may be said that while the testimony of this witness is not altogether clear, there is nothing in our judgment to indicate that he meant to say that he found heads which, while remaining in their original form, were being pulled up through the sheet, thus making depressions therein of the size of the heads themselves. The rounded head of each stay bolt covered the crown sheet for a short distance about the hole through which the stay bolt extended, and was directly exposed to the fire. And the testimony of this witness evidently means nothing more than that he found six bolts, the heads of which—due to the great heat to which they were subjected, and the pulling strain upon them—were being forced off, and in some cases perhaps the head, softened by the heat, being to some extent drawn into the hole occupied by the stay bolt. He says that he found "heads pulling through the sheets, heads pulled off," and he attempts to explain this by saying: "Just like the heads pulled off the sheet, through the sheet." At this point defendant's counsel interposed this question: "You said heads pulled off?" And he answered: "Yes, sir." When he said: "Just like the heads pulled *off the sheet,* through the sheet," he evidently meant to explain that the bolt heads were being forced off and to some extent being pulled into the bolt holes in the sheet. And that this was the tenor and purport of his testimony further appears from his answer to the question then propounded to him by defendant's counsel, above set out. Nowhere does he refer to any depression made by any bolt head in the

crown sheet itself. And there is not a word of testimony elsewhere in the record to indicate that any defect whatsoever existed in this perforated sheet of steel which covered the fire-box.

The burden was upon plaintiff to adduce evidence tending to affirmatively show that the crown sheet proper was defective, if plaintiff wished to submit this question to the jury as a predicate of liability. But there appears to be no evidence that the crown sheet was defective, when considered apart from the radial stays. We therefore hold that the court committed no error in confining the issue to defective radial stays in the crown sheet, as it did by giving defendant's instructions, and that plaintiff's motion for a new trial should not have been sustained because of such supposed error.

It is argued that, in any event, it was error to give defendant's instruction number 5, instructing the jury to return a verdict for defendant if, from evidence in the case, they were unable to determine the cause of the explosion, or if it appeared to them just as reasonable that the explosion was the result of low water in the boiler as that it was due to defective radial stays. But we see no error in this. The burden was upon plaintiff to prove the negligence alleged, and to trace the cause of the explosion to such negligence, if any, with reasonable certainty, not leaving it in the fog of conjecture and speculation. Undoubtedly there was much evidence on defendant's part tending to show that the accident could not have happened and did not happen by reason of such defects in the radial stays as plaintiff's evidence tends to establish—assuming that such defects existed, which defendant disputed. Indeed it is here argued that there was no substantial evidence that such defects did cause or could have caused the explosion, and that the demurrer to the evidence should have been sustained; but we shall not go into this feature of the case. In view of the burden

resting upon plaintiff, we do not regard this instruction as erroneous. It devolved upon plaintiff to reasonably establish a causal connection between the negligence, if any, and the injury, and to show that the former was the proximate cause of the latter. If the injury might have resulted from one of two causes, for but one of which the defendant could be held liable, it was necessary for plaintiff to show with reasonable certainty that the cause for which defendant could be held liable produced the result. [See Warner v. Railway Co., 178 Mo. l. c. 134, 77 S. W. 67; Kane v. Railroad, 251 Mo. 13, 157 S. W. 644.] And unless the jury found that the evidence preponderated in favor of plaintiff on the vital issue in the case, it was their duty to find for defendant. If they regarded the evidence as to this evenly balanced defendant was entitled to a verdict. [See Denchler v. Insurance Co., 51 Mo. App. l. c. 156; Carlich v. Met. St. Ry. Co., 129 Mo. App. l. c. 728, 729, 108 S. W. 584.]

We conclude, therefore, that the court should not have set aside the verdict in defendant's favor. While trial courts are vested with a wide discretion in the matter of granting new trials, where, as here, a motion for new trial is sustained through a pure mistake of law, in the erroneous belief that error was committed at the trial, the court's action will be reversed on appeal unless it can be upheld on some other ground of the motion. [See Barr v. Hays, 172 Mo. App. 591, 155 S. W. 1095.] It is not contended that the order appealed from can be sustained on any other ground of the motion, and it quite clearly appears that it could not. The cause was fairly tried and no good reason appears for depriving the defendant of the benefit of the verdict received by it at the hands of the jury.

The order granting a new trial will therefore be reversed and the cause remanded with directions to reinstate the verdict and enter judgment for defend-

ant thereon. It is so ordered. *Reynolds, P. J.*, concurs. *Nortoni, J.*, dissents in an opinion filed.

## DISSENTING OPINION.

NORTONI, J.—I dissent from the opinion of the court in this case because it unduly restricts the effect of the evidence, as I view it. The question in decision presents the inquiry as to whether there is substantial evidence tending to prove the crown sheet of the locomotive—that is, the roof of the fire-box—was defective at the time of the explosion. It is true much of the evidence pertains rather to the defective condition of the radial stays, but, even so, it appears to me there is an abundance in connection therewith to authorize a finding by the jury that the crown sheet too was defective. This evidence was given by the witness E. E. Hopson, who, it appears, was for several years a boiler maker in the employ of defendant at its round house in Moberly and inspected the fire-box, including the crown sheet, of the engine the very day before the explosion occurred. He made the inspection in the line of his duty and reported his finding at the time to the superior in charge of the work—that is, Ryan. After testifying that he had been in the employ of defendant as a boiler maker and engaged in the duties incident thereto for years at Moberly where this locomotive was in the round house, the following questions and answers appear:

"Q. How long had you been so employed? A. Thirteen years. Q. How long with the Wabash? A. Thirteen with the Wabash. Q. I will ask you what your duties were? A. My duty was to inspect the engine, and see what work was to be done, and do the work on it. Q. How did you make inspections of engines? A. Take a torch and go inside of the fire-box and look it over; take a hammer and hit on the bolts; look at the flues. Q. You may explain the construc-

tion of a crown sheet to the jury? A. Well a crown sheet is just like the roof to a house, to the fire-box, the water is between the fire-box and the wagon top that is out side of the boiler, the stay bolts or radial stays connect with this fire-box and wagon top and riveted in and hammered over on both sides. Q. What is the purpose of these radial stays or stay bolts? A. The purpose is to hold the fire-box. Q. To hold the fire-box in position? A. Yes, sir. Q. I will ask you if you inspected engine No. 2301 on that day? A. Yes, sir. Q. What time? A. In the forenoon. Q. That was on the 8th day of November, 1910? A. Yes, sir. Q. Where did you inspect it? A. In the round house at Moberly. Q. Now what did you do when you inspected that engine? A. Went in the fire-box, took the torch in, looked round over it, hammered over the stay bolts and listened for the sound. Q. What did you find with reference to the condition of the engine? A. I found five broken stay bolts and about six bolts pulling through the sheet. Q. Where did you find them? A. On the left front corner. Q. What report, if any, did you make of that condition?

"Mr. Robertson: Q. Did you make a report in writing? A. Yes, sir. Q. Did you—to whom? A. I made a report to Mr. Ryan. Q. I say, did you make a report in writing? A. No, sir. Q. Sign it? A. No, sir.

Examination continued by Mr. Phillips:

Q. Did you make a report to him of anything? A. I went and told the round house boiler maker the condition of the engine, he came and looked at it, he came down pretty soon, poked his head in the door and come back and said, "Cork her up and let her go, we have got to have her." I went ahead and corked it up. Q. Who did you say the boiler maker was? A. Tom Ryan. Q. When was that? A. About ten o'clock I judge, in the forenoon. Q. Now what would be the effect of broken radial stays? A. Well, that be

weaken the crown sheet, if too many get broken pressure of steam break it down. Q. How many did you say you found broken? A. Six broken. Q. And what was the condition of the others you found? A. Heads pulling through the sheet, heads pulled off, just like the heads pulled off the sheet, through the sheet. Q. (Mr. Robertson) You said heads pulled off? A. Yes, sir.

. . . . . . . . . . . . . . . . . .

Q. I will ask you, in your experience as a boiler maker, if the engine was in fit, proper condition to go on the road? A. No, sir. Q. Why? A. Because dangerous.

Counsel for defendant objects, asks be stricken out, conclusion of the witness, not stating facts.

Court: Objection overruled.

To which ruling of the court defendant then and there at the time excepted and still excepts. Q. What was there danger of? A. Crown sheet coming down. Q. What is the result of the crown sheet coming down? A. Blow up the boiler.

Cross-examination by Mr. Robertson:

. . . . . . . . . . . . . . . . . .

Q. Well, what was it you went in this engine to do on that day? A. The report. Q. What work did you go to the engine to perform? A. I corked up crown bolts and flues. .

. . . . . . . . . . . . . . . . . .

Q. Well, now what did you do with engine 2301, what was the first thing you did when you got to the engine? A. Opened the fire-box door and went into the fire-box. Q. You did that of your own volition? A. Yes, sir. Q. What did you find inside of the fire-box? A. Flues leaking and stays pulling through. Q. You did not find any radial stays broken? A. Yes, sir. Q. Where were they? A. Up in the left front corner. Q. Now just describe the condition of those radial stays you found broken? A. Well them stays set like

this (indicating) crown sheet is oval. Q. Now those radial stays are above the crown sheet? A. Screw into the crown sheet.

. . . . . . . . . . . . . . .

Q. How did you discover they were broken? A. You can hammer and tell by the sound of them.

. . . . . . . . . . . . . . .

Why didn't you put it in safe condition? A. Do you have any idea what kind of a job that is? Q. No, you tell; you know; why didn't you go ahead and put it in safe condition? A. Why, I did not have the job of general overhauling; I did the light repair.''

In my judgment, the court very properly set the verdict aside because the issue was submitted by instructions on the part of defendant, in the view that there was no evidence tending to prove the crown sheet was defective.